**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States Department of Labor, Petitioner,**

v.

**JAFFE NEW YORK DECORATING; Hartford Accident & Indemnity Company; Nancy King, Widow of Philip A. King, Respondents.**

No. 93–1085.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1994.

Decided June 10, 1994.

---

Samuel J. Oshinsky, Atty., U.S. Dept. of Labor, Washington, DC, argued the cause for petitioner. With him on the brief were Carol A. De Deo, Associate Sol., U.S. Dept. of Labor and Marianne Demetral Smith, Atty., U.S. Dept. of Labor, Washington, DC.

William S. Sands, Jr., Washington, DC, argued the cause for respondent. With him on the brief was John C. Duncan, III, Alexandria, VA, William P. Dale, Bowie, MD, entered an appearance.

Before: WALD, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Philip King, now deceased, was employed as a painter by Jaffe New York Decorating Company ("Jaffe"). In his first week on the job, King was seriously injured when one of the support ropes holding his boatswain's chair snapped, causing him to fall thirty feet to the ground. King sustained a severe back injury that rendered him a paraplegic, as well as internal damage that left him incontinent. After his accident, King filed a claim for workers' compensation benefits against Jaffe and its insurance carrier. An Administrative Law Judge ("ALJ") found that King was permanently totally disabled and thus entitled to full benefits from his employer.

Jaffe conceded that King was totally disabled, but argued that its liability should be limited under section 8(f) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 908(f) (1988) ("Act"), made applicable to the District of Columbia under the District of Columbia Workmen's Compensation Act of 1928, D.C.Code §§ 36–501, 502 (1973).[1] In seeking relief under section 8(f), Jaffe claimed that King had a pre-existing

---

1. The 1928 D.C. Act has been superseded by the District of Columbia Worker's Compensation Act of 1979, D.C.Code Ann. §§ 36–301 to 36–345 (1981 & Supp.1993), which became effective in July 1982.

condition of alcoholism, without which he would not be totally disabled. Under section 8(f), if an employee has a pre-existing permanent partial disability that is known to his employer, and without which the employee would not be totally disabled, the employer's liability for compensation is limited to the first 104 weeks of permanent disability, and any additional compensation is paid from the special fund established by section 44 of the Act. *See* 33 U.S.C. § 944 (1988). The ALJ held that Jaffe was not entitled to partial relief under section 8(f) because King's work-related injuries alone rendered him totally disabled. Jaffe appealed to the Benefits Review Board ("Board" or "BRB").

The Board vacated the ALJ's decision. The Board's order rested on findings that King's accident was not so severe that the resulting disability made it impossible for him to consider full-time employment, that King would have had viable employment opportunities absent his alcoholism, and that King's allegedly debilitating lack of motivation was attributable to his alcoholism. On each of these factual issues, the Board substituted its findings for those of the ALJ. The Director of the Office of Workers' Compensation Programs, Department of Labor ("Director"), now petitions for review of the Board's order, claiming that the Board exceeded the proper scope of review in vacating the ALJ's decision. Because we find that the ALJ's decision was fully supported by the record, we grant the Director's petition for review, vacate the Board's order and reinstate the ALJ's denial of section 8(f) relief to Jaffe.

## I. Background

In May 1977, Philip King began working as a painter for Jaffe. Soon thereafter, King fractured his lumbar spine when the boatswain's chair on which he was working fell thirty feet to the ground. As a result of the accident, King was rendered a paraplegic, requiring the use of crutches for life. He also suffered extensive neurological damage

and permanent loss of bowel and bladder control. King filed a claim for workers' compensation benefits with the Director of the Office of Workers' Compensation Programs, and an ALJ conducted a formal hearing. In connection with his claim, King was evaluated by two physicians and several vocational counselors. In addition to his work-related injuries, the doctors and counselors also considered King's history of alcoholism that predated his employment with Jaffe.

Dr. Langloh and Dr. Gordon conducted medical examinations of King, documenting the extent of his physical injuries and describing his limitations. Both doctors offered their views on King's prognosis for returning to work. King also underwent a week-long work evaluation conducted by the Tennessee Division of Vocational Rehabilitation. The Tennessee center found that King had the aptitude for retraining, but was too severely disabled to work a full day. Stanley Scher, a private rehabilitation specialist, conducted a battery of tests with King and researched the availability of jobs that he believed King could handle. Scher testified for Jaffe and offered his opinion that King was employable so long as potential employers were unaware of his history of alcoholism.

In his initial decision,[2] the ALJ found that King was permanently and totally disabled, *i.e.*, suitable employment was unavailable to someone in his condition. ALJ Decision and Order ("ALJ Decision"), *reprinted in* Joint Appendix ("J.A.") 2–3. At the hearing, Jaffe conceded that King was permanently totally disabled, but argued that its liability was limited because King's alcoholism constituted a pre-existing partial disability under section 8(f) of the Act. As noted above, section 8(f) limits an employer's liability for compensation to 104 weeks, if "but for" a pre-existing disability the totally disabled benefits claimant would be employable.

The ALJ assumed that alcoholism constituted a permanent partial disability under section 8(f), but found that Jaffe had failed to

---

**2.** Although the case was remanded to the ALJ from the Board twice, the principal findings of the ALJ are those stated in his Initial Decision rendered in 1982. Likewise, although the case was before the Board on several occasions, the principal findings at issue here are those in the May 2, 1986 order of the Board vacating the ALJ's decision. This decision of the ALJ and order of the Board are the focus of our consideration on review.

prove that King's work-related injuries alone were insufficient to render King permanently totally disabled. In support of his decision, the ALJ relied on the medical evidence of King's physical condition and the Tennessee vocational assessment. The Tennessee center had concluded that King was "probably too severely disabled to consider for either full time sheltered employment, or full time competitive employment...." Certification of Ineligibility, *reprinted in* J.A. 47. The ALJ expressly rejected Scher's testimony that there were jobs available that King could manage. Because Scher had no experience in evaluating and pursuing placement for persons as severely disabled as King, the ALJ gave no weight to his testimony. ALJ Decision, J.A. 3–4. Instead, the ALJ concluded that, "in th[e] current economic climate, it is hard to conceive that a virtual paraplegic with no control over his bowels and bladder would be able to obtain employment from anyone other than a beneficent employer."[3] *Id.* at 4. Further, he found that only an exceptionally motivated individual would be able to overcome disabilities of King's severity and successfully secure and maintain gainful employment. The ALJ found that King was not so motivated.

On appeal, the Board vacated the ALJ's decision. It held that the ALJ's determination that a person in King's position would have difficulty getting a job in the current economic climate was a personal view that could not be substituted for that of Jaffe's vocational expert. Additionally, the Board said the ALJ erred in relying on King's lack of motivation to secure a job. In the opinion of the Board, King's lack of motivation was "inextricably tied to his pre-existing alcoholism...." Benefits Review Board Decision and Order ("Board Order"), *reprinted in* J.A. 10. Finally, the Board dismissed the ALJ's

reliance on the Tennessee vocational counselor's report that suggested King's disability was so severe as to preclude full-time employment. The Board concluded that because the counselor's report did not indicate that King's disability was due solely to his back injury, the ALJ's reliance on it was unfounded. The Board vacated the ALJ's section 8(f) decision, finding it unsupported by the record. The Director then petitioned for review in this court.

## II. DISCUSSION

■ The Director argues that the Board exceeded the proper scope of review when it vacated the ALJ's decision. Under 33 U.S.C. § 921(b)(3) (1988),

> the BRB is required to accept the ALJ's findings of fact as conclusive if they are supported by substantial evidence on the record as a whole. Similarly, this Court's scope of review is limited when reviewing the decisions of the BRB. The only issues we may consider are: (1) whether the BRB adhered to the applicable scope of review; (2) whether the BRB committed any errors of law; and (3) whether the ALJ's findings of fact are supported by substantial evidence on the record taken as a whole.

*Whitmore v. AFIA Worldwide Ins.*, 837 F.2d 513, 515 (D.C.Cir.1988) (footnote and citations omitted). In assessing the findings of the ALJ, "[i]t is immaterial that another factfinder might have reached a different result in a *de novo* hearing." *Id.* at 516. Thus, the Board has no authority to second-guess the findings of the ALJ if those findings are supported by substantial evidence. In this case, because we find that the ALJ's decision was fully supported by the record,

---

**3.** We do not mean to imply by our ultimate disposition of this case that disabled Americans can find employment only with particularly "beneficent employers." Present national policy toward Americans with disabilities, adopted by Congress well after the injuries to the claimant in this case, is expressed in the congressional findings and purposes to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 (1988 & Supp. IV 1992) ("It is the purpose of this chapter ... (4) to invoke the sweep of congressional authority, including the power to enforce the

fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."). *See also* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").

and because we can discern no legitimate basis for the Board's reversal of that decision, we are constrained to grant the Director's petition for review.

█ Section 8(f) of the Act is designed to discourage employers from refusing to hire persons with disabilities out of fear that they may become liable for both the pre-existing injury and a post-hire work-related injury. *See Bechtel Assocs., P.C. v. Sweeney,* 834 F.2d 1029, 1035–36 (D.C.Cir.1987). The purpose of section 8(f) is realized by limiting an employer's compensation liability to 104 weeks when a permanent disability is "materially and substantially greater" than it would be absent an infirmity predating employment. In such cases, a portion of the claimant's compensation is paid from a special fund that is supported by the contributions of insurance carriers. 33 U.S.C. § 944 (1988). To qualify for section 8(f) relief, an employer must prove: (1) the employee had a pre-existing permanent partial disability; (2) the pre-existing disability was manifest to the employer; and (3) the pre-existing disability contributed to the seriousness of the permanent total disability caused by the second, work-related injury giving rise to the employee's claim. *Bechtel,* 834 F.2d at 1036.

█ The only question raised by the parties in this action relates to the third element—whether King's alcoholism contributed to the severity of his total disability. To satisfy this element, the employer must show "that a claimant's subsequent injury *alone* would not have caused the claimant's total permanent disability." *Director, OWCP v. Luccitelli,* 964 F.2d 1303, 1306 (2d Cir.1992) (emphasis in original). An employer cannot satisfy this standard merely by demonstrating that an employee's pre-existing injury compounded his employment-related injury. Rather, the employer must show that "but for" the pre-existing disability the claimant would be employable. This inquiry is a factual one, *Director, OWCP v. Campbell Indus., Inc.,* 678 F.2d 836, 840 (9th Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983), *overruled in part on other grounds by* 709 F.2d 616, 619 (9th Cir.1983), and the Board must accept the ALJ's finding on this point as long as it is supported by substantial evidence on the record as a whole.

█ After carefully examining the record in this case, we are convinced that the Board exceeded the permissible bounds of review in vacating the ALJ's decision, for there is ample evidence to support the ALJ's finding that King's work-related physical injuries alone rendered him totally disabled. The full record supports the two central findings that form the basis of the ALJ's decision: (1) King's accident left him too disabled to obtain and hold a suitable job; and (2) King lacked the exceptional motivation that would be required to overcome his disabilities and return to the workplace through a rehabilitation and retraining program.

There is no dispute that the severity of King's employment-related injuries made it very unlikely that King would again be able to maintain gainful employment. Dr. Langloh and Dr. Gordon, the two physicians who evaluated King, extensively described the serious physical limitations that resulted from the accident and explained that any future employer would have to be especially accommodating: King would be unable to lift any more than 20 pounds; he could not be asked to stand for any length of time; he could not bend or stoop frequently; and he would have to remain very close to a rest room because he suffered from total incontinence, requiring regular catheterization to avoid wetting.

It is also apparent from the record that, due to his work-related injuries, King did not have the stamina to work a full day. King was evaluated in a work environment by the Tennessee vocational center for approximately one week. On his first day in the evaluation program, King worked for only two hours before saying he had to return home, and he was completely absent the second day. *See* Situational Assessment, *reprinted in* J.A. 48. King returned for the next four days, but was able to work no more than four hours each day before he felt he could not continue. *Id.* The program management coordinator attributed King's poor work tolerance to his physical injuries: "[King's] inability to work a full day is a major concern in possible job placement. If his *physical* con-

dition improves to the point that he could work more hours, it is suggested that he be reassessed." *Id.* (emphasis added). King eventually dropped out of the program. The final report of one of the vocational counselors concluded: "Mr. King is probably too severely disabled to consider for either full time sheltered employment or full time competitive employment. . . ." Certification of Ineligibility, J.A. 47.

■ The Board believed that the Tennessee vocational counselor's statement that King was too severely disabled to hold a full-time job was unreliable, because the statement *might* have been based on the combination of King's physical disabilities and his alcoholism. But this is pure speculation that finds no support in the record. The Tennessee vocational center evaluated King's employment potential more extensively than did Scher, Dr. Langloh or Dr. Gordon. The center identified King's poor work tolerance as the single greatest impediment to full employment, and attributed it to King's *physical* condition. During the entire period when King was observed, *not one counselor* identified a drinking problem as a contributing factor to King's inability to complete a day's work. The Board's supposition that the Tennessee center may have intended its description of King's "disability" to be read as including King's alcoholism seems specious; and, in any event, it was the ALJ's role, not the Board's, to interpret and weigh the report. The ALJ's interpretation of the Tennessee center's assessment was reasonable, and the evidence it offered clearly undermined Jaffe's claim that King's work-related injuries alone did not leave him unemployable. In short, the Board had no legitimate grounds upon which to discount the probative value of the report from the Tennessee vocational center.

Jaffe does not attempt to minimize King's physical disabilities, but instead argues that alcoholism drained King's motivation to pursue available work and to undergo rehabilitation and retraining. Without intending to assess the significance of this claim, if true, we find that it simply is not borne out by the record. In addition to being a finding of fact directly at odds with the ALJ's findings, the

Board's assertion that "the record establishes that claimant's lack of motivation is inextricably tied to his pre-existing alcoholism . . .," J.A. 10, is at best an overstatement. While it is clear from the record that bouts of drinking at times had a negative effect on King's attitude, the evidence does not demonstrate that, absent his drinking problem, King would have had the requisite drive to seek out and successfully complete a retraining program.

Dr. Langloh and Dr. Gordon, on whose medical evaluations Jaffe places great weight, qualified their opinions that King could return to part-time work by suggesting King first would have to undergo a rehabilitation and retraining program. *See* Dr. Langloh's April 4, 1978 Evaluation, *reprinted in* J.A. 34–35. Each doctor expressed doubt, however, that King had the temperament to get through such a regimen. Dr. Langloh explained:

It is my considered opinion that rehabilitation of this gentleman will be extremely difficult at the very least. *Because of his physical condition,* he is unable to perform any tasks which require prolonged walking or standing. He cannot do jobs which involve heavy manual labor. He cannot climb ladders. *He will have to be retrained in some occupation which requires the use primarily of his upper extremities, and in a job which requires not a great deal of intellectual function.*

*Id.* at 35 (emphasis added). Dr. Langloh later wrote:

I feel that retraining is going to be extremely difficult because this patient does not appear to have either the desire nor the ability to be retrained. He continues to have bouts of heavy drinking, however, I think these have been somewhat less in the [last] several months.

Dr. Langloh's April 24, 1979, Follow-up Letter, *reprinted in* J.A. 36. Dr. Gordon, similarly, questioned whether King had the motivation to overcome his physical limitations:

From the review of the records and present examination it would appear that this man is not well motivated and does have a history of regular alcoholic intake which

would certainly retard any attempt at rehabilitation. . . .

Dr. Gordon's Orthopedic Consultation, *reprinted in* J.A. 43.

Dr. Gordon suggested that King's drinking problem, if current, might be an impediment to rehabilitation, but his statement did not suffice to satisfy Jaffe's burden of proving that King would have been employable *but for* his alcoholism. In fact, neither doctor came close to saying this. (Indeed, Dr. Langloh's reference to "bouts of heavy drinking" is offered almost as an after-thought, and it is tempered with the observation that King's "drinking . . . [had] been somewhat less" in recent months.) At best, the doctors' evaluations suggest that King's past history of drinking was one factor to be considered in assessing his chances for a successful return to the workplace. But the physicians' reports mostly stressed King's physical limitations, and they also highlighted his poor intelligence, his lack of dependability, and his difficult temperament as inhibiting factors. Additionally, the reports from the Tennessee vocational center attribute King's poor work prospects to his physical limitations, not to his drinking. On the whole, the record is far from clear in proving that any impediments to rehabilitation were "inextricably linked" to King's alcoholism; and, more importantly, the evidence on this point was hardly adequate to justify the Board's usurpation of the ALJ's factfinding responsibilities.

Furthermore, the testimony of Jaffe's vocational expert, Mr. Scher, similarly did not clearly demonstrate that "but for" his alcoholism King could have found a suitable job. Scher testified about numerous available jobs that he believed King could handle. He also opined that "*if* his alcoholism is still a problem," a potential employer would not hire King. Hearing Transcript, *reprinted in* J.A. 109. In Scher's opinion "[t]hat would be too much to expect of an employer, particularly in a tight economy right now." *Id.* at J.A. 110. Thus, Scher's testimony does not purport to show that alcoholism sapped King's motivation for rehabilitation. Scher merely hypothesized, without basis, that *employer bias*, combined with King's physical disabilities, would render King unemployable "*if* his

alcoholism is still a problem." *Id.* at 109–10. He did not say that King had an alcohol problem that in fact rendered him unemployable.

Even if Scher's testimony is somehow probative of the impact of King's drinking problem on his total disability, the ALJ, acting within his discretion, rejected it as not credible. Determining witness credibility is indisputably within the realm of the ALJ's unique authority. *Avondale Indus., Inc. v. Director, OWCP*, 977 F.2d 186, 189 (5th Cir. 1992) ("As a fact finder, the ALJ determines questions of credibility of witnesses and of conflicting evidence."). One reason cited by the ALJ for giving Scher's testimony little weight was that Scher had no experience placing persons as severely disabled as King. The Board thought this an inadequate basis for rejecting Scher's testimony "in view of the fact that no similar individuals had been referred to him." Board Order, J.A. 10. That no similar individuals had been referred to Scher does not somehow fortify his testimony. Whatever the reason for it, Scher's lack of experience is most certainly a relevant consideration in deciding how much weight to give his opinion. The Board was wrong to suggest otherwise.

Clearly, the ALJ had a sound evidentiary basis for finding that Jaffe failed to prove that alcoholism robbed King of the high motivation needed to overcome the severity of his injuries through rehabilitation. Rather than considering whether the ALJ's decision was supported by the record, the Board independently examined the evidence and substituted its determinations for those of the ALJ. This it is statutorily forbidden to do.

### III. Conclusion

For the foregoing reasons, we grant the Director's petition for review, vacate the Board's decision and reinstate the ALJ's order denying section 8(f) relief.

*So ordered.*